IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHILDCRAFT EDUCATION CORPORATION,<br>2920 Old Tree Drive<br>Lancaster, PA 17603<br><br>Plaintiff,<br><br>v.<br><br>ALICE'S HOME<br>2784 Shady Ridge Drive<br>Columbus, OH 43231<br><br>and<br><br>WILLIAM WEDD<br>2784 Shady Ridge Drive<br>Columbus, OH 43231<br><br>and<br><br>ALICE WEDD<br>2784 Shady Ridge Drive<br>Columbus, OH 43231<br><br>Defendants. | C. A. No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Childcraft Education Corporation ("Childcraft") for its Complaint against Defendants Alice's Home, William Wedd and Alice Wedd alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.  Childcraft is a New York corporation with its principal place of business at 2920 Old Tree Drive, Lancaster, Pennsylvania 17603.

1

RLF1-2895309-1

2. Upon information and belief, Alice's Home is an unincorporated sole proprietorship owned and operated by William Wedd and located at 2784 Shady Ridge Drive, Columbus, Ohio 43231.

3. William Wedd is the owner and sole proprietor of Alice's Home, and he resides at 2784 Shady Ridge Drive, Columbus, Ohio 43231. Because a sole proprietorship does not exist as a legal entity separate from its owner, Defendant William Wedd is personally liable for the conduct of Alice's Home.

4. Alice Wedd is an Ohio resident residing at 2784 Shady Ridge Drive, Columbus, Ohio 43231.

5. This court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and all Defendants, and the amount in controversy exceeds $75,000, exclusive of costs and interest.

6. Jurisdiction and venue are appropriate because the claims asserted herein arise out of, are in connection with and/or are with respect to the License Agreement between Plaintiff and Defendant Alice's Home/William Wedd, attached hereto as Exhibit A, and/or the subject matter of the License Agreement, and Defendants are subject to and expressly consented to jurisdiction and venue in this Court by agreeing to a forum selection clause in the License Agreement, which states, in relevant part at numbered paragraph 16:

> 16. <u>Governing Law</u>. This Agreement shall be governed by and construed, interpreted and enforced in accordance with the laws of Delaware. Any disputes arising out of, in connection with or with respect to this Agreement, the subject matter hereof, the performance or non-performance of any obligation hereunder, or any of the transactions contemplated hereby shall be adjudicated in a court of competent civil jurisdiction sitting in the City of Wilmington, Delaware and nowhere else. Each of the parties hereto hereby irrevocably submits to the jurisdiction of such court for the purposes of any suit, civil action or other proceeding arising

out of, in connection with or with respect to this Agreement, the performance or non-performance of any obligation hereunder, or any of the transactions contemplated hereby[.]

## FACTUAL BACKGROUND

7. Childcraft develops, manufactures and sells furniture, teaching aids, and other school supplies.

8. Upon information and belief, Alice's Home/William Wedd develops, manufactures and sells school supplies.

9. Alice's Home/William Wedd and Childcraft are competitors.

10. Alice Wedd worked for Childcraft as a sales representative from approximately 1995 through May 2003, first as an independent contractor. Ms. Wedd became an employee in or about October 1997. As a sales representative, Ms. Wedd had access to and did access Childcraft's trade secrets, including customer lists and pricing information.

11. In April 1998, Alice's Home/William Wedd and Childcraft entered into a License Agreement, attached hereto as Exhibit A. The License Agreement granted to Childcraft an "exclusive license" to market, offer for sale, sell and manufacture the "Extra Wide Language Easel," which was depicted in exhibit A to the License Agreement.

12. The License Agreement was signed by William Wedd on behalf of Alice's Home.

13. Childcraft has performed all of its obligations under the License Agreement.

14. In or about May 2003, Childcraft learned that Alice's Home/William Wedd were marketing, offering for sale, selling and manufacturing the "Extra Wide Language Easel" in violation of Childcraft's exclusive license granted by the License Agreement.

15. At some point in time, but prior to May 2003, Ms. Wedd began performing services for Alice's Home/William Wedd. In fact, the telephone and facsimile numbers for

3

ordering purposes listed in Alice's Home's/William Wedd's catalog were numbers paid for by Childcraft for Alice Wedd to use in her job duties for Childcraft.

16. Childcraft learned that Ms. Wedd was working for Alice's Home/William Wedd and competing with Childcraft in or about May 2003 and Ms. Wedd admitted that she was doing so.

17. Upon information and belief, Ms. Wedd disclosed Childcraft's trade secrets to Alice's Home/William Wedd, without Childcraft's express or implied consent, despite the fact that she knew or had reason to know, at the time she disclosed the trade secrets, that her knowledge of the trade secrets had been acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

18. Upon information and belief, Ms. Wedd used Childcraft's trade secrets for her own benefit and for the benefit of Alice's Home/William Wedd, without Childcraft's express or implied consent, despite the fact that she knew or had reason to know, at the time she used the trade secrets, that her knowledge of the trade secrets had been acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

19. Upon information and belief, Alice's Home/William Wedd acquired Childcraft's trade secrets despite the fact that it knew or had reason to know that the trade secrets were acquired by improper means.

20. Upon information and belief, Alice's Home/William Wedd used Childcraft's trade secrets for its own benefit, without Childcraft's express or implied consent, despite the fact that Alice's Home/William Wedd knew or had reason to know, at the time it used the trade secrets, that its knowledge of the trade secrets were derived from or through a person, Alice Wedd, who owed a duty to Childcraft to maintain the trade secrets' secrecy or limit their use.

## COUNT ONE
### (Breach of Contract: Alice's Home/William Wedd)

21. Childcraft re-asserts the allegations of paragraphs 1 through 20 as if fully rewritten herein.

22. Alice's Home/William Wedd breached the License Agreement by marketing, offering for sale, selling and manufacturing the "Extra Wide Language Easel."

23. Because a sole proprietorship does not exist as a legal entity separate from its owner, Defendant William Wedd is personally liable for the obligations contained in the License Agreement, and he likewise is liable for breaching the License Agreement.

24. As a direct and proximate result of Defendants' breach, Childcraft has sustained damages in the form of, among other things, lost profits in excess of $75,000.00 and in an amount to be proved at trial.

## COUNT TWO
### (Misappropriation of Trade Secrets: All Defendants)

25. Childcraft re-asserts the allegations of paragraphs 1 through 24 as if fully rewritten herein.

26. Childcraft took reasonable efforts to maintain the secrecy of its trade secrets, including its customer lists and pricing information, which derived independent economic value from not being generally known to, and not being readily accessible by proper means by, other persons who could obtain economic value from their disclosure or use. Therefore, such information constitutes trade secrets within the meaning of Delaware's Uniform Trade Secrets Act, Del. Code Ann. tit. 20, § 2001, *et seq.*

27. Upon information and belief, and as further described in paragraphs 16 through 19, above, Defendants have misappropriated Childcraft's trade secrets in violation of Delaware's Uniform Trade Secrets Act, Del. Code Ann. tit. 20, § 2001, *et seq.*

28. Defendants' misappropriation of Childcraft's trade secrets was willful and malicious.

29. Defendants were unjustly enriched and personally benefitted from the misappropriation of Childcraft's trade secrets.

30. As a direct and proximate result of Defendants' unlawful conduct, Childcraft has sustained compensatory damages in excess of $75,000.00.

31. Because Defendants' misappropriation of Childcraft's trade secrets was willful and malicious, Childcraft is entitled to exemplary damages in an amount not exceeding twice any award of compensatory damages.

## COUNT THREE
### (Breach of Employee Duty of Loyalty: Alice Wedd)

32. Childcraft re-asserts the allegations of paragraphs 1 through 31 as if fully rewritten herein.

33. As an employee of Childcraft, Alice Wedd owed Childcraft a fiduciary duty of loyalty. This duty required her not to use or disclose Childcraft's confidential, proprietary or trade secret information except in furtherance of Childcraft's business and barred her from performing services for a competitor of Childcraft, such as Alice's Home/William Wedd.

34. Alice Wedd breached her fiduciary duty of loyalty to Childcraft by acting in a manner contrary to the best interests of Childcraft while employed by Childcraft, in using Childcraft's confidential and proprietary business information and trade secrets to benefit herself

RLF1-2895309-1

and Alice's Home/William Wedd, in misappropriating Childcraft's confidential, proprietary information and trade secrets and in competing with Childcraft.

35. As a proximate result of the Alice Wedd's breach of her fiduciary duties, Plaintiff Childcraft sustained compensatory damages in excess of $75,000.00.

36. Childcraft further seeks an award of punitive damages as a result of the willful and wanton acts of Alice Wedd.

## COUNT FOUR
### (Unjust Enrichment: All Defendants)

37. Childcraft restates and incorporates the allegations contained in paragraphs 1 through 36 as if fully rewritten here.

38. As a result of Defendants' wrongful actions, they have been unjustly enriched at the expense of Childcraft.

39. It would be unlawful and unjust for Defendants to retain the benefits of their wrongful actions.

WHEREFORE, Childcraft prays that the Court enter judgment for it on its Complaint against Alice's Home, William Wedd and Alice Wedd, that it award to Childcraft all its compensatory damages and all other relief, both legal and equitable, to which it may be entitled and as the Court deems appropriate, including, without limitation, costs, pre- and post-judgment interest, attorneys' fees and exemplary damages to the extent permitted by law.

## JURY DEMAND

A trial by jury is hereby demanded for all issues triable by jury.

 

*/s/ Kelly E. Farnan*
Allen M. Terrell, Jr. (#709)
(terrell@rlf.com)
Kelly E. Farnan (#4395)
(farnan@rlf.com)
Richards, Layton & Finger
One Rodney Square
920 King Street
P.O. Box 551
Wilmington, DE  19899

Attorneys for Plaintiff
Childcraft Education Corporation

OF COUNSEL:
Mark S. Floyd
Christopher R. Johnson
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, OH 44114-1291
Tel:  (216) 566-5500

Dated:  July 1, 2005

# EXHIBIT A

# LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement"), is made and entered this 1st day of April 1998, by and between ALICE'S HOME: TOOLS FOR TEACHERS, a sole proprietorship duly organized and existing under and by virtue of the laws of the State of Ohio, whose address is 2784 Shady Ridge Drive, Columbus, Ohio 43231 ("Licensor"), and CHILDCRAFT EDUCATION CORP., a New York Corporation duly organized and existing under and by virtue of the laws of the State of New York, whose address is 2920 Old Tree Drive, Lancaster, PA 17603 (" Licensee").

## BACKGROUND

Licensor is the owner of all rights, titles and interests in and to the Extra Wide Language Easel which is depicted in Exhibit "A" to this Agreement (the "Product"). Licensee desires to obtain an exclusive license under the Intellectual Property Rights to market, offer for sale, sell and manufacture the Product. For the purpose of this Agreement the term "Intellectual Property Rights" shall mean any rights which the Licensor shall have related to any United States or foreign patent to which the Licensor has title as of the date of this Agreement, as well as any application for a United States or foreign patent made by the Licensor or rights for which an application could be made related to the Product (the "Patent Rights") or any United States or foreign copyright owned by the Licensor as of the date of this Agreement, including any registration of copyrights, in the United States Copyright Office or the equivalent thereof in any foreign county, as well as any application for a United States or foreign copyright registration made by the Licensor related to the Product as well as any trademarks registered in the United States Patent and Trademark Office or the equivalent thereof in any state of the United States or in any foreign country, and (ii) all of the unregistered Trademarks, that the Licensor now owns or uses in connection with the Product ("Trademark"). Subject to and in accordance with the terms of this Agreement, Licensor is willing to grant such license.

## PROVISIONS

Therefore, in exchange for the covenants, rights, and duties as herein described, the adequacy of which is acknowledged by all parties hereto, Licensor and Licensee agree as follows:

1. <u>Certain Definitions</u>. In addition to other terms defined elsewhere in this Agreement, the following terms shall have the following meanings, respectively (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

1

"Covered Product" shall mean the Product and any other product (regardless of the dimensions of such other product) designed, marketed, offered for sale, sold, assembled or manufactured by Licensee which is substantially similar to the Product in its design features.

"Net Invoice Price" shall mean the gross selling price of each Covered Product sold by or for Licensee, less any of the following (but only insofar as they pertain to the sale of any such Covered Product by or for Licensee and are included in such Covered Product's gross selling price): (a) sales use or excise taxes paid directly or indirectly by Licensee; and (b) any shipping costs actually paid and separately itemized by Licensee. (c) normal and customary trade discounts, returns and allowances actually allowed thereon.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party, or government (whether federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

2. <u>Grant of License</u>. Subject to the terms and conditions set forth in this Agreement, Licensor hereby grants to Licensee an exclusive license under the Intellectual Property Rights: (a) to market, offer for sale, sell and manufacture the Product: and (b) to use the Trademark in connection with the marketing and sale of the Product (the "License"). Licensee shall not have the right to grant sub-licenses under the License without prior written consent of Licensor.

3. <u>Royalties</u>.

a. Licensee shall pay Licensor semi-annually as described in Section 3(c) a royalty equal to eight percent (8%) of the Net Invoice Price for each Covered Product sold by or for Licensee and assembled, used, leased or sold anywhere in the world.

b. The royalty described in subparagraph 3(a) of this Agreement shall accrue when the Licensee shall receive payment for the sale of a Covered Product. Receipt of payment for the sale of a Covered Product shall be deemed to upon the actual receipt of currently available funds for such sale by the Licensee.

c. The accounting period for payment of royalties shall be on a calendar basis for the respective periods ending June 30 and December 31 of each year. Within 30 days of the end of each accounting period, Licensee shall furnish Licensor with

2

a written statement (certified as true and correct by an authorized officer of Licensee) of the total Net Invoice Price of all Covered Products sold in the preceding accounting period, setting forth the essential information concerning the sales by or for Licensee of all Covered Products subject to royalty and upon which royalty is calculated. Such information shall include such information as is reasonably necessary to enable Licensor to verify the accuracy of the royalty calculation. Payment of the royalties described in subparagraph 3(a) of this Agreement shall be due on a monthly basis and shall be payable on the tenth (10th) day of the month following the month of accrual of said royalties. The licensee shall include with each payment the written statement required to be furnished by Licensee pursuant to the terms of this Section 3(c).

    d.  Licensee agrees that it will at all times keep complete, true and correct books of account containing a current record of sales and other data in sufficient detail to enable the royalties payable under this Agreement to be computed and verified. Licensee further agrees to permit Licensor, its duly authorized agent or an independent certified or other public accountant selected by Licensor at the sole expense of the Licensor to have access for inspection and/or to make copies of such books of account at reasonable intervals during Licensee's normal business hours. The cost of any such audit shall be borne by Licensor. In the event that any audit of Licensee's books of account results in a determination that Licensee has paid less than the amount required under this Agreement, Licensee shall immediately pay the additional amount due.

    4.  Relationship Between the Parties. Licensor and Licensee are both independent contractors and not joint ventures with, or partner, agents or employees of, each other and neither Licensee nor Licensor shall in any respect by act or omission represent or imply, or permit any representation or implication by the act of omission of any other Person, that it is a joint venturer with, or the partner, agent or employee of, the other or in any respect authorized or empowered to act on behalf of the other, except as specifically provided under the terms of this Agreement.

    5.  Representations and Warranties. Licensee and Licensor each represent and warrant to each other that: (a) it is a corporation, partnership, sole proprietorship or limited liability company as described in the preamble to this agreement duly organized, validly existing and in good standing under the laws of the state of its incorporation, organization or formation; (b) it has the necessary power and authority to execute, deliver and perform its obligations under this Agreement, and all such action has been duly and validly authorized by all necessary proceedings on its part; and (c) this Agreement has been duly executed and delivered by it and constitutes the legal, valid and binding obligation of it enforceable against it in accordance with its terms. Licensor also represents and warrants to Licensee that to the best of Licensor's actual knowledge, the

3

Product does not infringe the patent, trademark or copyright rights of any Person. Further the Licensor to the best of its knowledge warrants and represents to the Licensee that:

    (i) Licensor is the sole owner of the Intellectual Property Rights related to and necessary for the Production and marketing of the Product.

    (ii) Licensor has the full power and authority to make this Agreement and to grant hereunder, and has not previously assigned, transferred or otherwise encumbered the same.

    (iii) The Intellectual Property Rights of the Product are not in the public domain.

    (iv) The Product does not infringe any statutory or common law Intellectual Property Right of a party other than the Licensor.

    (a) Licensee will indemnify and hold Licensor harmless from any loss, costs or damages, including reasonable attorneys' fees, in connection with any claim, action or proceeding inconsistent with, or arising out of breach or alleged breach of, Licensee's warranties, representations and agreements contained in this Agreement. The Licensor may also defend any such claim, action or proceeding. Licensor shall have the right to participate in the defense at Licensor's own expense with counsel of Licensor's own choosing. Any settlement of a claim, action or proceeding as to which this indemnity applies shall be subject to Licensor's approval, not to be withheld unreasonably.

    (b) The warranties, representations and indemnity by Licensor and Licensee herein shall survive termination of this Agreement for any reason.

    (c) Licensee shall, at its own cost and expense, take such legal action, in Licensor's name if necessary, as may be required to restrain any infringement of any of the Intellectual Property Rights of the Licensor related to the Product or to seek damages therefor, but shall not be, liable to Licensor for failure to take such legal steps. If Licensor elects to join in such proceeding the expenses and recovery shall be shared equally. If Licensee proceeds without Licensor's participation, any recovery shall belong to Licensee. If Licensee does not bring such action, Licensor may do so in Licensor's own name and at Licensor's own cost and expense and money damages recovered by Licensor for any infringement shall belong to Licensor.

    (d) Licensee may, in its reasonable discretion, withhold its reasonable estimate of the total damages and expenses (including reasonable attorneys' fees) from sums otherwise payable to Licensor pursuant to this or any other agreement between Licensor and Licensee, and to apply such sums to payment of such damages (including but not

4

limited to lost profits of the Licensee) and expenses. Notwithstanding the foregoing, in the event that Licensee shall have been notified of a claim or demand, if said claim or demand shall not result in a suit or proceeding within one year of notice to Licensee, and Licensee shall have incurred no costs, Licensee shall release the withheld funds, except that (i) Licensee may continue to withhold said funds if Licensor has a reasonable basis to believe that a suit or proceeding shall be commenced within a reasonable time thereafter, and (ii) Licensee may again commence withholding funds should a suit or proceeding be commenced after any release of withheld funds.

    6.    <u>Duration and Termination</u>.

    a.    Unless otherwise terminated as hereinafter set forth, this Agreement and License granted in this Agreement shall continue in force until two (2) years after December 31 of the year of the last publication or catalog in which the Product is included, provided however, that the term of this Agreement and the License granted hereunder shall automatically renew and extend for additional one-year periods unless and until either party shall have provided the other party with at least 12 months' written notice of its intention to terminate this Agreement as of the end of the current term.

    b.    Notwithstanding anything to the contrary contained in this Agreement, if Licensee shall at any time default in rendering any of the statements required under this Agreement, in paying any monies due under this Agreement, or in fulfilling any of the other obligations of this Agreement, and such default shall not be cured within 30 days after notice thereof is given by Licensor to Licensee, Licensor shall have the right immediately to terminate this Agreement by giving notice of termination to Licensee, such termination being effective upon Licensee's receipt of such notice. Licensee shall have the right to cure any such default up to, but not after, the giving of such notice of termination.

    c.    Except as provided in paragraph 6 (a) this Agreement, upon the occurrence of any of the following events, either party shall have the right immediately to terminate this Agreement by giving written notice of termination to the other party, such termination being effective upon such party's receipt of such notice and subject to paragraph 6 (a) of this Agreement: (i) the dissolution or liquidation of such party; (ii) the insolvency or bankruptcy of such party, whether voluntary or involuntary, or (iii) the death of an individual Licensor.

    d.    The waiver of any default under this Agreement by either party shall not constitute a waiver of the right to terminate this Agreement for any subsequent or like default, and the exercise of the right of termination shall not impose any liability by

5

reason of termination nor have the effect of waiving any damages to which such party might otherwise be entitled.

      e. The termination of this Agreement for any cause outlined in this paragraph 6 shall in no manner interfere with, affect or prevent the collection by Licensor of any and all sums of money due to it under this Agreement.

      7. <u>Duties Upon Termination</u>. Upon termination of this Agreement pursuant to paragraph 6 of the Agreement, Licensee immediately shall: (a) discontinue any and all use of trademarks (including, without limitation, the Trademark), trade names or marks owned or controlled by Licensor or any colorable imitation therefore; (b) refrain from doing anything which would indicate that Licensee is associated or working with Licensor; (c) refrain from marketing the Product or any other Product which infringes on any of the Patent Rights; and (d) return to Licensor all proprietary and confidential material provided to Licensee pursuant to the terms of this Agreement, including all copies, records and representations thereof. Notwithstanding the foregoing sentence, Licensee shall have the right to dispose of any inventory of Covered Products existing on the date of termination, in the regular course of its business, and for this purpose the restrictions of (a), (b) and (c) of the foregoing sentence shall be deferred until six (6) months after the date of termination.

      8. <u>Ownership of Intellectual Property Rights</u>. Licensee hereby acknowledges and agrees that Licensor is the sole and exclusive owner of the Intellectual Property rights, and that nothing contained in this Agreement shall be construed to convey any right or proprietary interest in the Intellectual Property to Licensee, other than the License granted in this Agreement.

      9. <u>Negation of Warranty</u>. Except as expressly provided in paragraph 5 of this Agreement, no representation or warranty has been or is made by Licensor that the Product or parts thereof may be manufactured, used or sold free of patent rights or proprietary rights of other Persons; it being understood that Licensor shall not be liable for any loss, damage or expense arising from any claim for patent or other proprietary right infringement upon the manufacture, use, lease or sale of the Product or the exercise of the License under this Agreement.

      10. <u>Compliance with Laws</u>. Licensor and Licensee shall, during the term of this Agreement including any extension thereof, comply fully with all laws applicable to their respective obligations and activities under this Agreement.

      11. <u>Entire Agreement: Amendment</u>. This Agreement constitutes the entire and final agreement between the parties to this Agreement with respect to the subject matter

of this Agreement. This Agreement supersedes, in all respects, all other prior written or oral agreements between the parties to this Agreement relating to the subject matter of this Agreement. Neither this Agreement nor any of the provisions hereof can be changed, waived, discharged or terminated, except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

12. <u>Severability</u>. If any clause or provision of this Agreement is determined to be illegal, invalid or unenforceable under any present or future law by the final judgment of a court of competent jurisdiction, the remainder of this Agreement will not be affected thereby. It is the intention of the parties to this Agreement that if any such provision is held to be illegal, invalid or unenforceable, there will be added in lieu thereof a provision as similar in terms to such provision as is possible and be legal, valid and enforceable.

13. <u>Construction</u>. Paragraphs or other headings contained in this Agreement are intended for ease in reference and are not intended to affect the meaning or interpretation of this Agreement. This Agreement may be executed in several counterparts, each of which will be deemed as original document, but all of which will constitute a single document.

14. <u>Notices</u>. Any notice, payment, demand or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been given when delivered personally, nationally recognized express delivery service or by facsimile, receipt confirmed, to the party designated to receive such notice or on the date after the same is sent by certified mail, express delivery service, postage and charges prepaid, directed to the following addresses or to such other or additional address or to such other or additional address as any party might designate by written notice to the other parties:

| | |
|---|---|
| If to Licensee: | If to Licensor: |
| Childcraft Education Corp. | Alice's Home: Tools for Teachers |
| 2920 Old Tree Drive | 2784 Shady Ridge Drive |
| Lancaster, PA 17603 | Columbus, OH 43231 |
| Attn: Ronald Suchodolski | Attn: William E. Wedd |
| FAX: (717) 397-7586 | FAX: (614) 882-1879 |

15. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of Licensor, its successors and assigns. This Agreement shall be binding upon and inure to the benefit of Licensee, but shall not be transferable or assignable by Licensee to any person or entity without the written consent of Licensor.

16.     Governing Law. This Agreement shall be governed by and construed, interpreted and enforced in accordance with the laws of Delaware. Any disputes arising out of, in connection with or with respect to this Agreement, the subject matter hereof, the performance or non-performance of any obligation hereunder, or any of the transactions contemplated hereby shall be adjudicated in a court of competent civil jurisdiction sitting in the City of Wilmington, Delaware and nowhere else. Each of the parties hereto hereby irrevocably submits to the jurisdiction of such court for the purposes of any suit, civil action or other proceeding arising out of, in connection with or with respect to this Agreement, the subject matter hereof, the performance or non-performance of any obligation hereunder, or any of the transactions contemplated hereby (collectively, "Suit"). Each of the parties hereto hereby waives and agrees not to assert by way of motion, as a defense or otherwise in any such Suit, any claim that it is not subject to the jurisdiction of the above courts, that such Suit is brought in an inconvenient forum, or that the venue of such Suit is improper.

IN WITNESS WHEREOF, Licensor and Licensee have duly executed this Agreement on the day and year first above written.

ALICE'S HOME: TOOLS FOR TEACHERS

By: _____  4/6/98
William E. Wedd

CHILDCRAFT EDUCATION CORP.

By: _____  4/13/98
Ronald Suchodolski
President

8

ALICE - ORIGINAL   E. 1774

Top view annotations:
- 3/8
- 3/8
- 3/4
- 17
- 15 1/4
- 1 3/4
- NO GROOVE IN LEDGE
- APPROX 20 1/2"
- 3/8
- 1/8
- 3/8

Bottom view annotations:
- 46 1/2
- 1 3/16
- 9, 9, 3
- 2 3/8
- 3/4
- 1
- 1
- 31 1/4
- ALL EASEL MATERIAL
- 29 3/4
- 31 1/4
- 36 EASEL BOARD
- 36
- EASEL MATERIAL SCREEN POCKETS
- 31 1/4
- 3/4
- 2 3/8
- 24 1/8 EASEL BOARD